UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ROBERT LARRY LYTLE,<br>a/k/a Larry Lytle,<br><br>Defendant. | 5:17-CR-50020-01-RAL<br><br><br>**OPINION AND ORDER ON<br>DEFENDANT'S PENDING MOTIONS** |

In January of 2017, Robert Larry Lytle (Lytle) was indicted by a federal grand jury in an eighteen-count indictment alleging conspiracy, criminal contempt, mail fraud, wire fraud, obstruction of agency proceedings, and aiding and abetting, all of which related to his involvement in a scheme to market low level lasers called "QLasers" in interstate commerce as a treatment for multiple serious medical conditions. Doc. 1. Lytle pleaded guilty to a two-count superseding information—one count of conspiracy to introduce misbranded medical devices into interstate commerce in violation of 18 U.S.C. § 371 and 21 US.C. §§ 331 and 333(a)(2), and one count of criminal contempt in violation of 18 U.S.C. § 401(3)—in January 2018 in exchange for the United States's promise to dismiss counts one through eighteen of the indictment and to not prosecute his wife as a codefendant. Docs. 175; 178 at 3; 183 at 1; 232 at 17; 263 at 1.

This Court held a sentencing hearing for Lytle and his two co-conspirators on April 20, 2018. Doc. 256. Lytle was eighty-three years old at the time of his sentencing hearing. At the sentencing hearing, this Court heard from some of the victims of the conspiracy and then sentenced

1

each defendant separately. Doc. 256. During the portion of the hearing that pertained only to Lytle, this Court entertained and ruled on defense objections to the presentence investigation report, considered the numerous victim statements, considered letters of support that had been filed, heard from Lytle's family, entertained argument from counsel, and listened to Lytle's allocution statement delivered in open court. Doc. 324 at 114–198. After weighing the sentencing factors found in 18 U.S.C. § 3553(a), this Court imposed the statutory maximum sixty month custody sentence for conspiracy to introduce misbranded medical devices into interstate commerce and varied downward from the applicable guideline range of life imprisonment to impose an eighty-four month custody sentence, consecutive to the first count, on the criminal contempt charge. Docs. 263 at 2; 324 at 206; 406 at 2.

Lytle now has multiple motions pending before this Court. A motion for release from custody and a supporting affidavit were filed in Lytle's name seeking his release due to the current global health emergency, the COVID-19 pandemic. Docs. 430, 431. Three days later, a second motion for relief under the First Step Act was filed on Lytle's behalf by his Power of Attorney. Doc. 434. Lytle then moved to withdraw the first motion for release from custody along with the affidavit, Docs. 430 and 431, and asked the Court to consider only the second motion, Doc. 434. Doc. 437. For the reasons stated herein, Lytle's motion to withdraw documents, Doc. 437, is granted, his motion for release from custody, Doc. 430, therefore is denied as moot, and his motion for relief under the First Step Act, Doc. 434, is denied.

**I.     Summary of Relevant Facts**

The offenses to which Lytle pleaded guilty were very serious, and Lytle's fraud scheme created thousands of victims spread across the country and in different parts of the world. Doc. 239 at 22. Lytle was a dentist by training who had been barred from practicing dentistry due to a

scheme to market an unapproved dental device. Undeterred, Lytle then devised a scheme to market a low light laser called the QLaser to treat serious medical conditions. Docs. 179 at 2; 323 at 181. He ordered hundreds of QLaser devices from a manufacturer and distributed them to independent distributors he recruited to sell the devices to customers for human use. Doc. 179 at 2. Lytle created marketing materials implying that he was a medical doctor and that the device was an effective treatment for more than 200 medical conditions, giving the false impression that the safety and efficacy of the device had been scientifically tested. Doc. 179 at 2–3. Lytle's marketing material for the QLaser claimed it could provide therapy for an array of maladies, including different types of cancer, cataracts, cerebral palsy, diabetes, high blood pressure, multiple sclerosis, and Parkinson's disease. Doc. 229-3 at 89. Lytle's marketing even claimed the QLaser could be used to treat alcoholism, anger, and hiccups. Doc. 229-3 at 89. However, according to the factual basis statement signed by Lytle, there were no published, peer-reviewed clinical studies relating to the QLaser. Doc. 179 at 3. In fact, Lytle at one point labeled the QLaser as a "veterinary device" in an attempt to evade review by the Food and Drug Administration (FDA). Doc. 179 at 2.

The United States initially tried to stop Lytle's scheme through a civil enforcement action. On January 14, 2015, this Court entered a preliminary injunction requiring Lytle to cease the sale of the QLaser device and to allow FDA representatives to take, examine, and copy records relating to the QLaser. Docs. 179 at 3; 323 at 55–56. After this injunction was issued, Lytle, either directly or indirectly, continued to distribute the QLaser devices, and he refused to allow FDA agents to conduct an investigation into the records concerning the QLaser. Doc. 179 at 3.

The QLaser came at a significant cost, both financially and physically, for many of its purchasers. Lytle and his co-conspirators sold a variety of the QLaser devices for prices that

ranged from approximately $4,000 to $13,000 or more, and they intentionally targeted the elderly and individuals suffering from chronic, serious medical conditions as potential customers. Doc. 239 at 20, 22. Some of these purchasers forwent conventional medical treatment during the time they treated themselves with Lytle's QLaser. See Doc. 323 at 13, 87, 159. During the course of the conspiracy, more than three thousand individuals purchased the QLasers, and at least four hundred devices were sold after the issuance of the preliminary injunction. Doc. 239 at 22. Lytle made millions of dollars, and indeed Lytle acknowledged that proceeds of the QLaser sales totaled at least $16 million. Docs. 178 at 6; 239 at 22.

Lytle pleaded guilty to a two-count superseding information charging one count of conspiracy to introduce misbranded medical devices into interstate commerce and one count of criminal contempt. Doc. 175. Shortly before his sentencing hearing was set to take place, Lytle filed a motion to withdraw his guilty plea, Doc. 210, which was denied by this Court, Doc. 246. At Lytle's sentencing hearing, this Court had a lot to consider when arriving at the appropriate sentence. Prior to the hearing this Court had reviewed the presentence investigation report and its addendum, Lytle's motion for variance, and the government's sentencing memorandum. Doc. 323 at 115. The presentence investigation report concluded that, based on a number of enhancements, Lytle's total offense level was 43 and he was in criminal history category one, making his guideline range life imprisonment. Doc. 239 at 31; 264 at 1. This Court also had read dozens of letters of support submitted on Lytle's behalf and reviewed thousands of pages of victim impact information. Doc. 323 at 115–16. At the hearing, this Court heard video recorded and live victim statements and heard from one of Lytle's daughters on his behalf. Doc. 323 at 7–15, 135–42. This Court heard arguments on the objections to the presentence investigation report and overruled all

but one, withholding ruling on the objection to the lack of a two-level reduction for acceptance of responsibility until the end of the hearing. Doc. 323 at 117–33.

During his allocution statement, Lytle attempted to shift blame and provide excuses for his behavior. Doc. 323 at 177–191. He claimed that he sold the QLaser devices only for a short period of time and that they were primarily sold by thirty-three other companies (his distribution network). Doc. 323 at 177. He acknowledged that the device may not have gotten results all of the time, but he insisted that it never hurt anybody. Doc. 323 at 179. When Lytle claimed he had organized double blind placebo-controlled studies using the QLaser on Type II diabetes, this Court questioned why that study was not included in the more than ten thousand pages of documents that it had been provided. Doc. 323 at 183. Lytle could point to no such study, which is unsurprising,[1] considering that the factual basis statement he signed in accordance with his guilty plea indicated that "[i]n fact, there are no published, peer-reviewed clinical studies regarding the QLaser device." Docs. 179 at 3; 323 at 183. Lytle urged this Court to believe that because only ten percent of those who purchased the lasers returned victim surveys, that must mean that his lasers achieved a ninety percent success rate, and he unequivocally stated "I make no apologies for the QLaser. I believe in it." Doc. 323 at 189. He further falsely asserted that "[he] never violated that preliminary injunction." Doc. 323 at 191.

After hearing Lytle's allocution statement, this Court revisited the pending objection to the presentence investigation report about the nonapplication of a two-level reduction for acceptance of responsibility. Doc. 323 at 199. This Court concluded that many of Lytle's statements during his allocution contradicted his factual basis statement and did not display an acceptance of

---

[1] There is of course no conceivable way that a low light laser can regulate a person's blood sugar or cause the pancreas to secrete proper amounts of insulin in a person with Type II diabetes.

5

responsibility. Doc. 323 at 199. Therefore, this Court declined to apply the two-level reduction, leaving Lytle's guideline range at life imprisonment. Doc. 323 at 200.

After determining the applicable guideline range, this Court conducted an inquiry into the other sentencing factors found in 18 U.S.C. § 3553(a). This Court detailed the nature and circumstances of the offense, outlining Lytle's actions and his deception of vulnerable victims and the FDA. Doc. 323 at 200–204. This Court discussed the ways in which Lytle blatantly violated the preliminary injunction and his exceptionally questionable behavior while on pretrial release. Doc. 323 at 204. Next, this Court looked to Lytle's personal history and characteristics and noted his professional accomplishments prior to losing his dentistry license and acknowledged his many letters of support and his service on the Rapid City city council. Doc. 323 at 205. After carefully weighing the sentencing factors, this Court determined that a sufficient, but not greater than necessary, sentence for the eighty-three year old Lytle was sixty months imprisonment on the conspiracy to introduce misbranded medical devices into interstate commerce charge and eighty-four months imprisonment on the criminal contempt charge to run consecutive to the first count. Doc. 323 at 206. This Court reasoned that this sentence, which was effectively twelve years, would be sufficient to reflect the proper punishment, deterrence, and necessary protection of the public. Doc. 323 at 206. This Court noted that by the time of his release at age ninety-five, Lytle should no longer be a threat to perpetrate more fraud, but nevertheless imposed a two-year term of supervised release to follow custody "in case he does outlive his sentence." Docs. 324 at 206–07; 406 at 3.

Lytle had several health conditions of which this Court was well aware at the time of sentencing. Lytle detailed some of his health conditions in his motion to withdraw his guilty plea, Doc. 210 at 7–8, and his daughter discussed several of them during her statement in open court,

Doc. 323 at 136–41. Both explained how Lytle treated his serious ailments by using his QLaser, controlling his diet, and creating other accommodations and exercises for himself. Docs. 210 at 7–8; 323 at 136–41. They were concerned that if Lytle would receive a prison sentence he would not be able to maintain his physical health through these means and that he would likely die in custody. Docs. 210 at 7–8; 323 at 136–41.

Just prior to the formal imposition of his sentence, Lytle once again addressed this Court and stated, "I do not accept or consent to incarceration based upon behalf of the defendant." Doc. 323 at 208. Nonetheless, this Court imposed the sentence as contemplated with restitution to be determined at a later hearing. Lytle was remanded into custody.

As could be predicted based on his age and his personal health practices, Lytle's health conditions have not improved since he entered Bureau of Prisons (BOP) custody. According to a BOP medical report generated on June 11, 2020, Lytle currently suffers from sleep apnea, reduced vision in both eyes, hypertensive heart disease without heart failure, diverticulosis of intestine, osteoarthritis of hip, and a disorder of the prostate. Doc. 452 at 4. Lytle has been issued a CPAP machine by the BOP to treat his sleep apnea, but he claims an inability to use it consistently due to not always having a place to plug it in at night. Docs. 434-1 at 5; 436-2 at 5; 443 at 19, 67. Lytle's vision likely causes him significant difficulties in BOP custody. According to a letter from the Eye Institute which treated Lytle prior to his incarceration, Lytle had 20/50 vision in his right eye and 20/400 vision in his left eye, and his doctor expressed that Lytle "will have a hard time reading, recognizing faces and seeing objects… He will not be able to read emails, create emails, use a telephone without assistance or read a monitor." Doc. 434-1 at 17. Lytle has had the opportunity for eye examinations while in BOP custody but has refused such examinations against BOP recommendations. Docs. 436-2 at 5, 101; 452 at 141, 155. Lytle also has consistently high

blood pressure readings, but he refuses treatment for the condition. Lytle entered the BOP with a history of high blood pressure and has had his blood pressure monitored by BOP medical staff. The blood pressure readings taken since Lytle entered custody have been wide ranging, but generally elevated and sometimes significantly elevated. See Docs. 436-2 at 51; 452 at 61–62, 178, 290. Despite Lytle's hypertension, he has repeatedly refused to take medication to control his blood pressure, claiming that the medications will create other issues with his health. Docs. 452 at 13, 27, 30, 54, 102, 114, 120. Lytle has other ailments that cause hardship in BOP custody, including his age and osteoarthritis of the hip. Lytle has difficulty walking around the BOP facility and reportedly now spends part of his time confined to a wheelchair. Doc. 434-1 at 1–2. He also experiences increased difficulty with incontinence, which is exacerbated by his low mobility and for which he is issued adult briefs. Doc. 434-1 at 7; 436-2 at 5; 443 at 17. Lytle also claims to be experiencing decreased hearing, increasing his sense of isolation and depression. Doc. 434-1 at 4.

What could not be predicted at the time of Lytle's sentencing was that a new and mysterious illness would sweep across the world and substantially affect the United States's economy, its society, and its prison systems. The global COVID-19 pandemic reached the United States in early 2020 and has brought with it fear and confusion. COVID-19 is a respiratory illness that is spread easily from person to person and which has contributed to a large number of deaths in the United States. Despite the many unknowns that still exist relating to COVID-19, the Centers for Disease Control and Prevention (CDC) have identified some risk factors that put certain people at a higher risk for contracting a serious form of the illness if they become infected. The CDC has recognized that a person's risk for severe illness from COVID-19 increases with age, and the greatest risk for severe illness is among those who are 85 or older. See Older Adults, Centers for Disease Control and Prevention https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/older-adults.html (last visited Aug. 5, 2020). The CDC also has identified certain underlying medical conditions which put some people at higher risk of contracting a severe form of the illness. One of the conditions which the CDC recognizes might put a person at increased risk is hypertension or high blood pressure. See People with Certain Medical Conditions, Centers for Disease Control and Prevention https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions (last visited Aug. 5, 2020). In order to reduce such risk, the CDC recommends that individuals with high blood pressure take their medication exactly as prescribed and follow their healthcare provider's recommendations. Id.

Lytle is currently confined at Federal Correctional Institution Gilmer (FCI Gilmer), and has had two motions for relief under the First Step Act, sometimes referred to as a motion for compassionate release, filed on his behalf based on the risks presented by the COVID-19 pandemic. Docs. 430, 434. However, he has moved to withdraw the first such motion. Doc. 437. The government opposes the motion for compassionate release.

**II.     Legal Standard for Compassionate Release**

Generally, a "court may not modify a term of imprisonment once it has been imposed," except in a few, well-defined circumstances. 18 U.S.C. § 3582(c). The compassionate release statute as amended by the First Step Act of 2018 provides one of those narrow avenues through which a sentence may be modified. The compassionate release statute provides in pertinent part that:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or

9

> the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment ... after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; ...
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission

18 U.S.C. § 3582(c)(1)(A). "The district court has broad discretion in determining whether proffered circumstances warrant a reduction in sentence." United States v. Loggins, --- F.3d ---, 2020 WL 4375103 (8th Cir. 2020). The motion before this Court was not brought by the Director of the Bureau of Prisons. Therefore, this Court may reduce Lytle's sentence only if thirty days have passed since the warden of his institution received his request for sentence reduction.

### III. Discussion

### A. Timeliness

Lytle submitted a request for a reduction in sentence to the warden of his institution on January 24, 2020, based on his advanced age, his debilitating health conditions, and his wife's condition. Doc. 434-1. The government argues that Lytle has not satisfied the exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A) because his request, unlike the pending motion, was not based on COVID-19. The question of whether prior requests for a reduction in sentence may satisfy the exhaustion requirement has produced somewhat conflicting answers among district courts. Compare United States v. Jenkins, 4:15-CR-3079, 2020 WL 1872568, at *1 (D. Neb., Apr. 14, 2020) ("Simply put, the Court cannot consider a motion for compassionate release that is based on evidence or arguments that weren't presented to the Bureau of Prisons first."), with United States v. Brown, 4:05-CR-00227-1, 2020 WL 2091802, at *4-5 (S.D. Iowa, Apr. 29, 2020) (finding

10

that the compassionate release statute did not require the reasons presented to the warden be the same as those presented to the district court and that a defendant may raise new arguments to the court, "including a sudden, global pandemic"). Although the motion currently before this Court addresses the risks posed by COVID-19, it is largely based on Lytle's age and underlying health conditions which make him susceptible to severe illness. Those issues had been presented to Lytle's warden in his January request, and therefore, the COVID-19 pandemic now serves as a consideration relative to those health conditions raised in the request when evaluating whether "extraordinary and compelling reasons" warrant a sentence reduction.

### B. Compassionate Release

In determining whether a sentence reduction is warranted, this Court begins by considering the sentencing factors found in 18 U.S.C. § 3553(a). This Court provided a summary above of how it weighed those sentencing factors at the time of Lytle's sentencing hearing. Upon review, this Court concludes that the sentence Lytle received was sufficient but not greater than necessary to achieve the sentencing purposes identified in § 3553(a)(2).

The Court next looks to whether "extraordinary and compelling reasons" exist to justify a reduction in Lytle's sentence. Congress has left it to the Sentencing Commission to describe what constitutes "extraordinary and compelling reasons" when considering a sentence reduction under the compassionate release statute, and the Sentencing Commission has set forth those reasons in Federal Sentencing Guideline § 1B1.13. 28 U.S.C. § 994(t). Those reasons include the defendant's terminal illness or debilitating physical or mental condition, the defendant's age in combination with the proportion of his sentence served, and certain family circumstances. U.S.S.G. § 1B1.13 cmt. n.1(A)–(C). The Sentencing Commission also included a "catch all" provision which allows for the necessary finding when "[a]s determined by the Director of the

Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described" above. U.S.S.G. § 1B1.13 cmt. n.1(D). The Sentencing Commission has lacked a quorum since Congress passed the First Step Act which allowed courts to consider compassionate release motions brought by someone other than the Director of the BOP, and therefore has been unable to update these provisions. As a result, district courts have been left to question whether the policy statement still applies and whether courts may consider other extraordinary and compelling reasons not brought by the Director of the BOP under the "catch all" provision. See United States v. Mondaca, 89-CR-0655, 2020 WL 1029024, at *3 (S.D. Cal. March 3, 2020) (discussing the discord among district courts); United States v. Spears, 3:98-cr-0208-SI-22, 2019 WL 5190877, at *3 (D. Or. Oct. 15, 2019) (same); United States v. Brown, 411 F. Supp.3d 446, 449-50 (S.D. Iowa Oct. 8, 2019) (same). Many district courts have determined that the discretion given to the Director of the BOP by the Sentencing Commission extends to federal judges and allows them to consider "extraordinary and compelling reason[s] other than" those specifically described. United States v. Condon, No. 3:12-cr-00091-10, 2020 WL 2115807, at *3 (D.N.D. May 4, 2020) (listing cases that found federal judges may apply the "catch all" provision of U.S.S.G. § 1B1.13 comment note 1(D)).

The motion filed on Lytle's behalf does not make it clear under which subsection to U.S.S.G. § 1B1.13 comment note 1 he seeks relief. Upon review of the submitted materials, it appears he may be attempting to seek relief under either subsection (A), (C), or the "catch all" (D). Subsection (A) provides that the medical condition of a defendant may constitute an "extraordinary and compelling reason" for sentence reduction if

    (ii)    The defendant is
           (I)    suffering from a serious physical or medical condition,

> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 cmt. n.1 (A)(ii). Here, Lytle does appear to be experiencing deteriorating physical health due to the aging process and is suffering from physical and medical conditions that he claims affect his ability to provide self-care within the correctional institution. For example, he claims it is difficult for him to move around in the facility due to his poor eyesight from age-related macular degeneration and his hip condition. He also mentions issues with incontinence. However, the BOP has provided Lytle with tools to continue to provide self-care in the facility by issuing him a wheelchair and adult briefs and by recommending comprehensive eye exams which Lytle has refused. Docs. 434-1 at 1–2; 436-2 at 5, 101.

Subsection (C) to U.S.S.G. § 1B1.13 comment note 1 provides in relevant part that a defendant may establish an "extraordinary and compelling reason" by showing "the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13 cmt. n.1(C). Neither Lytle's motion to this Court, nor the supplement filed by the Federal Public Defender's Office present this argument. However, Lytle's request for sentence reduction submitted to the warden of his institution does address the needs of his wife, who suffers from dementia. Doc. 434-1 at 10. Therefore, this Court will also consider Lytle's motion under subsection (C). Although Lytle indicates that his wife relied heavily on him before his incarceration, he indicates that she has since moved to another part of the country to be closer to her sons who could then help her with her daily assistance needs. Doc. 434-1 at 10. Because Lytle's wife receives the assistance of her sons,

Lytle is not "the only available caregiver" for his wife, and he does not establish an "extraordinary and compelling reason" under this subsection.

The "catch all" provision of subsection (D) would allow this Court to consider the risks that the COVID-19 pandemic creates on individuals who are incarcerated., especially those who are elderly and who have certain underlying health conditions. There is no doubt that the effects of the COVID-19 pandemic have been extraordinary. It has disrupted nearly every American's way of life in some capacity. Despite these massive disruptions, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020). The question then becomes whether Lytle's advanced age and underlying health conditions create an "extraordinary and compelling reason" to justify compassionate release in light of the risks posed COVID-19.

The CDC has acknowledged that individuals over eighty-five are at the greatest risk for developing a severe illness if they contract COVID-19 and has identified hypertension as a condition which might increase a person's risk. Merely because Lytle is in both risk categories of course does not mean that he will contract the illness. Lytle is currently incarcerated at FCI Gilmer, and according to the BOP reporting website, there are currently no active inmate infections at that institution and only one active staff infection. See COVID-19 Coronavirus, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Aug. 7, 2020). There have been five inmate recoveries at the institution and no deaths. See id. Even if Lytle were to contract the disease, "a court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such a reduction because of his medical condition... [Section 3582] was

14

drafted using the word 'may,' not 'must.'" United States v. Rodriguez-Orejuela, No. 03-CR-20774-MORENO, 2020 WL 2050434 at *7 (S.D. Fla. Apr. 28, 2020) (alterations in the original) (quotation omitted).

This Court now undertakes the more difficult task of weighing the § 3553(a) sentencing factors against the risks currently posed to Lytle. Lytle's fraudulent marketing scheme, massive exploitation of vulnerable victims, and blatant disrespect of court orders were egregious. The risks posed by the COVID-19 pandemic are somewhat uncertain but are likely substantial. Lytle's filings make note that this Court specifically avoided imposing a life sentence at Lytle's sentencing hearing, but this Court clearly contemplated the likelihood of him spending the rest of his life in prison at that time. Doc. 323 at 206–07. Lytle has served only a small faction of the sentence imposed. Lytle has serious health issues and is elderly. Yet, Lytle was continuing criminal activity into his early eighties despite having those physical issues and was unrepentant to the very end of his case, indicating that he remains a danger to resume fraud schemes. At least some of his physical problems in BOP custody are exacerbated by his choice to refuse the recommended eye examination and blood pressure medication. When reviewing all of these considerations and his case as a whole, this Court concludes that a reduction in sentence to time served, even if it would include a condition of home confinement as part of supervised release, would not be sufficient to achieve the purposes of sentencing enunciated in § 3553(a). Therefore, Lytle's motion for relief under the First Step Act, Doc. 434, is denied at this time.

### C. Conclusion and Order

For good cause, it is hereby

ORDERED that Lytle's motion to withdraw documents, Doc. 437, is granted. It is further

ORDERED that Lytle's motion for release from custody, Doc. 430, is withdrawn and therefore denied as moot. It is further

ORDERED that Lytle's motion for sentence reduction under the First Step Act, Doc. 434, is denied.

DATED this 12th day of August, 2020.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE